UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
JOHN GARD,                                )
                                          )
        Plaintiff,                        )
                                          )
    v.                                    )        Civil Action No. 00-1096 (PLF)
                                          )
UNITED STATES DEPARTMENT OF               )
EDUCATION,                                )
                                          )
        Defendant.                        )
_____ )

OPINION

        This matter is before the Court on the motion of the defendant, the United States

Department of Education, for judgment on the pleadings or, in the alternative, for summary

judgment.  Upon consideration of the parties' arguments, the relevant legal authorities, and the

entire record in this case, the Court concludes that plaintiff John Gard has failed to identify any

genuine issues of material fact that would prevent the pretrial entry of judgment for the

defendant.[1]  Consequently, the Court will grant the defendant's motion and enter judgment for

the Department of Education.

_____

        [1]      The papers reviewed by the Court include the following: plaintiff's complaint
("Compl."); defendant's motion for judgment on the pleadings or, in the alternative, for summary
judgment ("MSJ"); defendant's Statement of Material Facts Not in Genuine Dispute ("DSMF");
plaintiff's opposition to defendant's motion ("Opp."); plaintiff's Statement of Material Facts in
Dispute ("PSMF"); defendant's reply in support of its motion ("Reply"); and plaintiff's surreply
("Surreply").

## I. BACKGROUND

The following summary of facts is based on (1) statements in the defendant's Statement of Material Facts Not in Genuine Dispute that were not contested by the plaintiff, and (2) documents whose authenticity has not been disputed by the plaintiff:

Plaintiff John Gard is now and was during all relevant periods employed as an accountant by the defendant Department of Education ("DOE").  DSMF ¶ 1.  In November 1997 and May 1998, Mr. Gard contacted various federal government officials, including employees of DOE's Office of the Inspector General, and alleged that DOE's flawed and inadequate accounting systems and security were facilitating financial mismanagement.  MSJ, Ex. 26 at 5; Compl. ¶ 7.  At least some of Mr. Gard's allegations concerning financial mismanagement were later substantiated by the United States Office of Special Counsel.  DSMF ¶ 15.

On May 8, 1998, a coworker of Mr. Gard emailed their joint supervisor, Janice Steinbrueck, and claimed that Mr. Gard had become "'irate'" with him and accused him of tampering with Mr. Gard's computer.  DSMF ¶ 24.  On June 17, 1998, Ms. Steinbrueck wrote a memorandum for inclusion in Mr. Gard's personnel file.  See id. ¶ 45; MSJ, Ex. 12 at 1.  She claimed in that memorandum that on June 16, 1998, she and two other coworkers had gone to Mr. Gard's office to discuss the operation of DOE's accounting software.  MSJ, Ex. 12 at 1.  According to Ms. Steinbrueck, Mr. Gard quickly became "hostile" during this meeting and began "yelling" and displaying "extreme anger."  Id. at 1-2.  Ms. Steinbrueck claimed that she was "very concerned for the welfare (physical safety) of those working closely with John, including myself."  Id. at 2.

On June 17, 1998, Ms. Steinbrueck and a coworker, Maureen Smith, met with Mr. Gard in Ms. Smith's office to warn him that yelling at colleagues at work was inappropriate. DSMF ¶ 65. The next day, Ms. Steinbrueck prepared a memorandum for Mr. Gard's personnel file in which she described her recollection of the previous day's meeting with Mr. Gard. See DSMF ¶ 65; Ex. 2 at Bates 1553. According to that memorandum, Mr. Gard became "violently angry" after Ms. Steinbrueck told him that she found his behavior of the previous day "unacceptable." Id. Ms. Steinbrueck claimed that Mr. Gard had denied that he had yelled the day before and then had asserted that Ms. Steinbrueck's admonishment of him was in reality an act of "reprisal" for his whistle-blowing. Id.

Also on on June 17, 1998, another coworker, Jeanne Johnson, sent an email to Ms. Steinbrueck in which she described an incident that had just occurred. See MSJ, Ex. 31, Attach. 4; DSMF ¶¶ 49-50. She alleged that Mr. Gard had "stomped" into her office, "so angry that his face was trembling," and accused her of improperly behaving as a "management representative" even though she was officially a representative of her union. Id. He then "stormed away." Id.

On June 18, 1998, another coworker of Mr. Gard, Ora Alger, submitted to supervisors a "memo to file" in which she alleged that she "fear[ed] and believ[ed] that [her] co-worker John Gard [was] unbalanced in his views and perceptions of [her] and towards [her]" because he repeatedly accused her of "using [her] position in the union to enhance [her] career, . . . and as a tool against him personally." MSJ, Ex. 32, Attachment 3 at 1. She claimed to fear that Mr. Gard was a threat to her physical safety. Id. She then alleged that, shortly after the August 1995 bombing of the Federal Building in Oklahoma City, Mr. Gard had said of the

bombing, "[T]hat was child's play, it was nothing compared to what I could do. . . . I could easily take out seven blocks around here, and no one would know it. . . . I used to be a demolition expert for the Army in Nam and they trained me well." Id. According to Ms. Alger, she had decided to report this encounter with Mr. Gard because, after hearing of Mr. Gard's June 16, 1998 confrontation with coworkers, she was becoming "fearful because his temper and accusations are intensifying." Id. at 2. She further reported that "[i]t has been rumored that John has a mental disorder cause[d] by his tour in Viet Nam," and suggested that he might need assistance with that condition. Id.

On June 19, 1998, Ms. Johnson wrote an email to her supervisors and to human resources personnel in which she expressed "concern[] for the welfare of Carolyn Ashby," a coworker. DSMF ¶ 52; MSJ, Ex. 31, Attach. 5. She stated that Ms. Ashby had witnessed the June 17 confrontation between Ms. Johnson and Mr. Gard and "was very frightened" because "she and [Mr. Gard] ha[d] a long history of confrontational problems[] that were never addressed by management. [Ms. Ashby] said that she . . . ha[d] been crying and upset" since the June 17 incident. Id.

During the time that Mr. Gard's coworkers were describing his behavior in these various emails and memoranda, it was well known in their office that Mr. Gard had filed a whistle-blower complaint with the Office of the Inspector General and the Office of Special Counsel in May 1998. See DSMF ¶¶ 37-38, 41. Mr. Gard made clear to DOE officials that he believed himself to be a victim of retaliation. In an email to various DOE officials written on June 17, 1998, Mr. Gard asserted that his confrontation with Ms. Steinbrueck and two other employees the previous day had occurred because Ms. Steinbrueck had come to his office "to

4

insult and belittle" him.  MSJ, Ex. 35.  He claimed that Ms. Steinbrueck's stated reason for

coming to his office — to assist him with a problem he said he had found in their accounting

software — was spurious, because "[t]here was absolutely no need for these three employees to

come to [his] office with the purpose of telling" him how to use the software; he knew "how to

accomplish" all of the relevant "functions."  He characterized the entry of Ms. Steinbrueck and

the other employees into his office as an act of "reprisal" and declared that he did "not have to

and [was] not going to put up with" it.  Id.  Also on June 17, 1998, Mr. Gard sent an email to the

Secretary and a Deputy Secretary of DOE in which he alleged that he had been called into a

meeting that day with Ms. Steinbrueck and Maureen Smith.  He stated that he "felt during the

meeting that Maureen Smith's statements were designed to intimidate and threaten" him, and that

"[a]ccordingly," the meeting "constitute[d] an additional instance of reprisal."  MSJ, Ex. 36 at 1.

According to Mr. Gard, Ms. Steinbrueck or Ms. Smith told him that he "was unqualified, that

[he] had not demonstrated any leadership ability or the ability to get along with people, that [he]

was not qualified to be a team leader and that [he] was a threat."  Id.  Mr. Gard claimed that he

"was being warned that if [he] continued to provide . . . information to and/or assist the Office of

Inspector General[,] . . . management would take adverse action against me."  Id. at 2.

On June 19, 1998, several DOE employees, including "representatives from the

Office of Management . . . and the Office of General Counsel" met to discuss the emails

circulated by Mr. Gard and his coworkers regarding the confrontations that had occurred over the

preceding few days.  DSMF ¶¶ 74-75.  One of the meeting's attendees reported that DOE's Chief

Financial and Chief Information Officer, Donald Rappaport, had been heard making a comment

concerning Mr. Gard and a gun.  Id. ¶ 76.  The meeting participants decided that DOE's Office of

General Counsel and some of its human resources personnel should investigate the situation concerning Mr. Gard further.  Id.

After that meeting, Paula Lelansky, a DOE employee who had attended the meeting and who specialized in various human resources issues, reviewed Mr. Gard's personnel file.  DSMF ¶¶ 71, 74, 79.  She then contacted Dr. Neal Presant, a doctor under contract with DOE as the Department's "medical review officer."  Id. ¶ 79.  She faxed him a memorandum in which Jeanne Johnson described the June 16, 1998 confrontation between herself, Jan Steinbrueck, and another coworker on one side, and Mr. Gard on the other.  Id. ¶ 80.  In that memorandum Ms. Johnson claimed that Mr. Gard had "shout[ed]" at them, accused her of usurping a team leader position that should have been his, "shak[en] his finger in [her] face," and finally declared that he "'would take care of all of [you].'"  MSJ, Ex. 7, Attach. 1 at 1-2.  Ms. Johnson expressed concerns over Mr. Gard's "rage" and "irrational, paranoid behavior."  Id. at 2.

In addition to that memorandum, Ms. Lelansky also faxed to Dr. Presant a form from Mr. Gard's file that was entitled "Health Benefits Registration Form," which she apparently found suggestive because Mr. Gard wrote "None now" under "Names of family members."  See MSJ, Ex. 7, Attach. 2; DSMF ¶¶ 80-81.   After reviewing the documents sent to him by Ms. Lelansky, Dr. Presant warned her that Mr. Gard could be a threat to his coworkers and advised that Mr. Gard be "remove[d] . . . from the work place" to protect those who worked with him.  DSMF ¶¶ 83-84.  He suggested that Mr. Gard be barred from the office until "medical documentation" from Mr. Gard's own physician could be reviewed.  Id. ¶ 84.

After speaking with Ms. Lelansky, DOE's Chief Financial and Chief Information Officer signed a letter placing Mr. Gard on paid administrative leave on June 19, 1998.  DSMF

¶ 90.  The letter was sent by Federal Express to Mr. Gard, who was away from work, on the same

day, but Mr. Gard did not receive it before reporting to the office for work on June 22, 1998.  Id.

¶ 90, 93.  Mr. Gard was also formally banned from DOE's buildings; a document saying so was

provided to the security guards posted at the buildings' entrances.  Id. ¶¶ 91-92.

       Mr. Gard reported for work on June 22, 1998, unaware that he had been placed on

administrative leave.  DSMF ¶ ¶ 93-94.  Ms. Lelansky learned of his presence, and a copy of the

June 18, 1998 letter placing Mr. Gard on administrative leave was delivered to him in person as

he was meeting with employees from the Office of Inspector General regarding his whistle-

blower claims.  Id. ¶ 96.  Federal Protective Services officers then escorted Mr. Gard from the

building.  Id. ¶ 97.

       After Mr. Gard's removal from the workplace, various DOE employees continued

to discuss his situation.  See DSMF ¶ ¶ 101-06.  Mr. Gard's legal counsel communicated with

DOE repeatedly regarding his client's work status.  Id. ¶¶ 104-09.  In October 1998, Danny

Harris, Mr. Gard's "second-level" supervisor, invited Mr. Gard to meet with him later that same

month to discuss "possible work assignments" for him.  Id. ¶ 111.  Mr. Harris also requested that

Mr. Gard provide certain information about his medical condition, including "[t]he findings of a

mental status examination and the results of psychological tests."  MSJ, Ex. 37, Attach. 5 at 2.

He mentioned an email sent by Mr. Gard to Ms. Steinbrueck on March 18, 1998, in which Mr.

Gard claimed that he was about to begin taking a medication "which could have possible adverse

side effects . . . inclu[ding] headaches, depression, hypertension, and mood swings."  Id. at 1.

Stating, "I am concerned that there may be relationship between your medical condition(s) and

your behavior in the workplace," Mr. Harris explained that "medical documentation" would

"assist us in determining whether or not there is a connection between medication you are taking and the events which took place in June, and whether your medication has been stabilized." Id.

It is not clear from the record whether the medical documentation requested was ever submitted by Mr. Gard. See DSMF ¶¶ 113-15. In any case, Mr. Harris permitted Mr. Gard to return to work on December 21, 1998, id. ¶ 115, and arranged for Mr. Gard to be assigned to a different first-line supervisor. MSJ, Ex. 37, Attach. 6. Even so, Jeanne Johnson continued to complain to her supervisors that Mr. Gard was attempting to intimidate her, this time by peering into her office on his way past her door, DSMF ¶ 119; she found this behavior ominous because "Mr. Gard worked in another section of the floor and had no work-related reason to interact with Ms. Johnson or with other people near her office." Id. Upon learning of Ms. Johnson's complaints, Mr. Gard's new supervisor asked Mr. Gard to stop using the corridor outside Ms. Johnson's office and to "refrain from doing anything that might be construed by Ms. Johnson as harassment." Id. ¶ 120.

As these developments related to Mr. Gard's position at DOE unfolded, Mr. Gard attempted on multiple occasions to demonstrate that his employer was retaliating against him for his whistle-blowing activity. On June 2, 1998, he submitted a whistle-blower complaint with the Office of Special Counsel. DSMF ¶ 13. Less than a month later, on June 30, 1998, he filed another complaint with the Office of Special Counsel, asserting that his placement on administrative leave as of June 19, 1998 was intended to punish him for "cooperating with and providing evidence to the Office of the Inspector General." MSJ, Ex. 22 at 19. He alleged that Federal Protective Services had been used to remove him from a DOE building on June 22, 1998, in order to "make a scene, an example out of me and to intimidate and control the other

employees who were starting to cooperate with the OIG." <u>Id</u>. at 19-20. Regarding the confrontations that occurred in the few days preceding his placement on administrative leave, Mr. Gard claimed that he was verbally "attacked" by his coworkers on June 16, 1998, and stated that although he was "not a physical threat to citizens, co-workers, or [him]self, . . . when [he] is attacked, [he] will defend himself." <u>Id</u>. at 13. He described his June 17, 1998 meeting with Janice Steinbrueck and Maureen Smith as "very hot and heated" and added that "[t]he more Maureen Smith tried to intimidate me the more determine[d] I became that I would not be intimidated. I met force with like force." <u>Id</u>. at 16.

      The Office of Special Counsel informed Mr. Gard on September 27, 2001 that it had completed its investigation of his retaliation claim and declined to pursue the matter further. <u>See</u> DSMF ¶ 16; MSJ, Ex. 24. Mr. Gard then filed a complaint with the Merit Systems Protection Board ("MSPB"), again alleging reprisal on the basis of his whistle-blowing activity. DSMF ¶ 17. In May 2002, DOE settled Mr. Gard's MSPB complaint by entering into a settlement agreement with him pursuant to which DOE did not admit any wrongdoing, but promised that it would (1) make no attempt to transfer Mr. Gard from his position before January 1, 2003; (2) give Mr. Gard a Quality Step Increase in his salary; and (3) refrain from taking any adverse actions against Mr. Gard in connection with "any incident or circumstance of his employment" that arose and was known to the agency before the effective date of the settlement agreement. <u>See</u> MSJ, Ex. 27 at 2-3. The agreement purported to resolve "all claims" that Mr. Gard had or might acquire against the agency "on account of incidents or circumstances of his employment arising before the date" of the agreement, with the exception of Mr. Gard's "claims under the Privacy Act other than issues raised in his . . . MSPB appeal." <u>Id</u>. at 4.

As part of the settlement agreement, DOE agreed that it would not "contest a[n MSPB] finding that [Mr. Gard] was the 'prevailing party' with respect to th[e] appeal . . . , nor a Board finding that any subsequent award of attorneys fees is 'warranted in the interest of justice.'" MSJ, Ex. 27 at 2. In keeping with that provision of the agreement, an administrative law judge found, without examining the merits of Mr. Gard's claims, that the MSPB had jurisdiction over Mr. Gard's complaint — and hence to enforce the related settlement agreement — because "the record establishes by preponderant evidence that the appellant engaged in whistleblowing activity . . .; [and] that the agency took or failed to take, or threatened to take or fail to take, personnel actions as defined in statute." Opp., Ex. 4 at 1; see Chakravorty v. Dep't of Air Force, 90 M.S.P.R. 304, 308 (MSPB 2001) (under precedent in effect at that time, an appellant making claims of reprisal related to whistle-blowing activity was required to establish jurisdiction by preponderance of the evidence).[2] The administrative law judge then entered the settlement agreement into the record of the MSPB so that it would be enforceable by the Board. Opp., Ex. 5 at 2.

On May 16, 2000, well before the conclusion of those proceedings before the MSPB, Mr. Gard filed his complaint before this Court, alleging that the Department of Education had violated his rights under the federal Privacy Act in the course of deciding that Mr. Gard should be placed on administrative leave beginning on June 19, 1998. Discovery began in 2000, but the case was stayed for a lengthy period during the pendency of related proceedings before the MSPB. That stay was lifted in August 2006, and discovery eventually concluded in May

---

[2]     Mr. Gard claims or implies on numerous occasions in his opposition to DOE's motion for summary judgment that he prevailed on the merits of his claims before the MSPB. See, e.g., Opp. at 2, 14, 15; PSMF ¶ 22. That assertion is clearly wrong, as the merits of Mr. Gard's MSPB complaint were never litigated.

2008, after which the defendant filed the pending motion for judgment on the pleadings or, in the

alternative, for summary judgment.

## II.  LEGAL STANDARD

Summary judgment may be granted if "the pleadings, the discovery and disclosure

materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v.

Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).[3]  "A fact is 'material' if a dispute over it might

affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or

unnecessary' do not affect the summary judgment determination."  Holcomb v. Powell, 433 F.3d

at 895 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  An issue is "genuine" if the

evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.  See

Scott v. Harris, 550 U.S. 372, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. at 248;

Holcomb v. Powell, 433 F.3d at 895.

When a motion for summary judgment is under consideration, "the evidence of

the non-movant is to be believed, and all justifiable inferences are to be drawn in [his] favor."

Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. Potomac Electric Power

Co., 447 F.3d 843, 849-50 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284,

1288 (D.C. Cir. 1998) (en banc); Washington Post Co. v. U.S. Dep't of Health and Human

Services, 865 F.2d 320, 325 (D.C. Cir. 1989).  The nonmoving party's opposition, however, must

---

[3]      The Court decides defendant's motion as one for summary judgment under Rule 56, rather than as a motion for judgment on the pleadings under Rule 12(c), because it considers matters outside the pleadings.  See Fed. R. Civ. P. 12(d).

consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-moving party is required to provide evidence that would permit a reasonable factfinder to find in his favor. Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50; see Scott v. Harris, 550 U.S. at 380 ("[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'") (quoting Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). To defeat a motion for summary judgment, plaintiff must have more than "a scintilla of evidence to support his claims." Freedman v. MCI Telecommunications Corp., 255 F.3d 840, 845 (D.C. Cir. 2001).

Under the Local Civil Rules of this Court, a party moving for summary judgment must submit "a statement of material facts as to which the moving party contends there is no genuine issue." Loc. Civ. R. 7(h)(1). For its part, the nonmoving party must file "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated." Id. In ruling on the motion for summary judgment, the Court "may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Id. In this case, the defendant has filed a detailed statement of facts addressing, among other things, the events leading up to Mr. Gard's placement on

administrative leave in June 1998.  See DSMF ¶¶ 24-90.  Mr. Gard's statement of facts that are

allegedly in dispute with respect to those events fails to specifically contest many of the factual

representations made by the defendant; instead of pointing to record evidence that undermines

the defendant's representations, Mr. Gard resorts to name-calling and unsupported accusations.

See, e.g., PSMF ¶16 (deeming the claims of Ora Alger and Jeanne Johnson "spurious" without

addressing the substance of those claims); ¶ 34 (calling Dr. Presant's statements regarding Mr.

Gard "preposterous" without offering any evidence refuting those statements).  Where Mr. Gard

has failed to respond to assertions contained in the defendant's statement of material facts, or has

responded only with conclusory denials, the Court has accepted the defendant's assertions as

presenting no questions of fact suitable for litigation at a trial.

## III.  DISCUSSION

As the D.C. Circuit has explained:

> The Privacy Act safeguards the public from unwarranted
> collection, maintenance, use and dissemination of personal
> information contained in agency records.  It does so by allowing an
> individual to participate in ensuring that his records are accurate
> and properly used, and by imposing responsibilities on federal
> agencies to maintain their records accurately.

Bartel v. Fed. Aviation Admin., 725 F.2d 1403, 1407 (D.C. Cir. 1984) (footnotes omitted).  One

way the Act "safeguards the public from unwarranted . . . dissemination of personal information"

is by restricting the manner in which agencies may maintain, use, and disclose "records" about an

individual maintained within a "system of records."  5 U.S.C. § 552a(b).

The Privacy Act enumerates four scenarios in which an individual may sue in district court to remedy a violation of the statute.  See 5 U.S.C. § 552a(g)(1).  Two are relevant here:

> . . . Whenever any agency
>
> . . .
>
> > (C) fails to maintain any record concerning an individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or
> >
> > (D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,
>
> the individual may bring a civil action against the agency.

5 U.S.C. § 552a(g)(1)(C), (D).  A plaintiff may recover money damages under Sections 552a(g)(1)(C) and 552a(g)(1)(D) only if he demonstrates that an agency violated one or both provisions "intentional[ly] or willful[ly]."  5 U.S.C. § 552a(g)(4).  Equitable relief is not available under either provision.  See Doe v. Stephens, 851 F.2d 1457, 1464 (D.C. Cir. 1988).[4]

---

[4]     Injunctive relief is available in a proceeding brought pursuant to 5 U.S.C. § 552a(g)(1)(A) or 552a(g)(1)(B), see 5 U.S.C. § 552a(g)(2), (g)(3), but the plaintiff does not purport to proceed under either of those provisions.  He nevertheless requests injunctions (1) "[o]rder[ing] Defendant to remove . . . from its records all documents pertaining to Plaintiff that are determined to be inaccurate," Compl. at 14; (2) "[e]njoin[ing] Defendant from continuing to maintain records regarding Plaintiff in violation of the Privacy Act," id. at 14-15; and (3) "[e]njoin[ing] Defendant from continuing to engage in further conduct in violation of the Privacy Act." Id. at 15.  Since the plaintiff does not proceed under provisions of the Privacy Act that authorize injunctive relief, and he has made no attempt to demonstrate that he meets the requirements of the provisions that do authorize such relief, he obviously cannot obtain the orders he requests.

Mr. Gard contends that that the defendant is liable to him under both of the foregoing provisions of the statute because DOE employees used and/or disclosed his records in violation of the Privacy Act in deciding to place Mr. Gard on administrative leave. In particular, his complaint alleges (1) that he was subjected to an adverse agency determination because of the agency's failure to maintain his records properly, in violation of Section 552a(g)(1)(C), see Compl. ¶ 63, and (2) that he was adversely affected by violations of the numerous "other provision[s]" of the Privacy Act, in violation of 5 U.S.C. § 552a(g)(1)(D). See Compl. ¶¶ 39, 42, 45, 48, 51, 54, 57, 60.

On the basis of these claims, Mr. Gard seeks damages equal to alleged actual damages, or at least equal to $1,000 per count of his nine-count complaint. See Compl. at 15-16. He also requests injunctive relief in the form of an order (1) requiring DOE "to remove and expunge from its records all documents pertaining to Plaintiff that are determined to be inaccurate . . . or incomplete," id. at 14; (2) preventing DOE "from continuing to maintain records regarding Plaintiff in violation of the Privacy Act," id. at 14-15; and (3) prohibiting DOE "from continuing to engage in further conduct in violation of the Privacy Act." Id. at 15.

The defendant argues that Mr. Gard's Privacy Act claims are preempted by the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 94-454, 92 Stat. 1111 (codified as amended in scattered sections of Title 5 of the United States Code), because they concern the "same [allegedly] prohibited personnel practices" that gave rise to his whistle-blower claims before the MSPB — namely, his placement on adminstrative leave, his removal from DOE's office building by Federal Protective Services officers, and the circulation among the building's security guards of a memorandum announcing that Mr. Gard was banned from the building. MSJ

at 18. But while the "CSRA deprives the district court of jurisdiction to review prohibited personnel practices," Hubbard v. EPA, 809 F.2d 1, 5 (D.C. Cir. 1986), it does not, contrary to the defendant's suggestion, necessarily preempt Privacy Act claims simply because the facts underlying those claims concern, in part, prohibited personnel practices. Where a plaintiff claims that his damages flowed from an "adverse personnel action" that was allegedly "*actually caused* by an inaccurate or incomplete record," his Privacy Act claims are not preempted by the CSRA and may proceed in district court. Id. (original emphasis).

At the same time, however, the Privacy Act is not to be used as an end run around the comprehensive remedial scheme created by the CSRA to address federal employment disputes. See Hubbard v. EPA, 809 F.2d at 5. To ensure that the plaintiff has not merely disguised a complaint governed by the CSRA as a series of claims under the Privacy Act, it is necessary to scrutinize closely any "asserted causation link" between the Privacy Act violations alleged and adverse federal personnel actions. Id. Thus, Mr. Gard's claims must fail to the extent that he has not produced any evidence supporting a reasonable inference that a Privacy Act violation itself actually caused the adverse events of which he complains.

### A. Mr. Gard's Claims Under 5 U.S.C. § 552a(g)(1)(C)

To prevail on a claim under 5 U.S.C. § 552a(g)(1)(C), Mr. Gard must prove that:

(1) he has been aggrieved by an adverse determination; (2) the [agency] failed to maintain his records with the degree of accuracy necessary to assure fairness in the determination; [and] (3) the [agency's] reliance on the inaccurate records was the proximate cause of the adverse determination. . . .

Chambers v. Dep't of Interior, 568 F.3d 998, 1007 (D.C. Cir. 2009) (internal quotation marks and citation omitted). If the claim is for damages, the plaintiff must also prove that "the [agency]

acted intentionally or willfully in failing to maintain accurate records." Id.  Two counts of Mr. Gard's complaint concern an alleged violation of Section 552a(g)(1)(C).  Count IX is a rote recitation of the language of that provision, along with an unadorned assertion that the defendant violated it.  See Compl. ¶ 63.  Count V alleges a violation of 5 U.S.C. § 552a(e)(5), which provides that an agency may "maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President."  See Compl. ¶ 51.  Claims predicated upon violations of Section 552a(e)(5), however, must be brought under 552a(g)(1)(C).  Deters v. U.S. Parole Comm'n, 85 F.3d 665, 660 (D.C. Cir. 1996).  Count V therefore is entirely duplicative of Count IX.

       Mr. Gard claims that he "suffered adverse actions when Defendant banished him from the workplace and, subsequent to his reinstatement, denied him employment and training opportunities."  Opp. at 18.  Mr. Gard's submissions, however, are devoid of any evidence of specific "employment and training opportunities" denied to him by the defendant.  His claims under Section 552a(g)(1)(C) therefore may challenge only what he fancifully calls his "banish[ment]" — the agency's determination to place him on administrative leave with pay in June 1998.  Mr. Gard's claims based on that determination fail, however, because Mr. Gard has failed to identify any evidence suggesting that the agency relied on inaccurate records in making that determination, or that any such reliance was the "proximate cause of the adverse determination."  Chambers v. Dep't of Interior, 568 F.3d at 1007.  Although the record does not, so far as the Court has been able to ascertain, contain a detailed list of the documents reviewed by DOE officials in June 1998 as they assessed Mr. Gard's workplace behavior, presumably they considered the emails and memoranda concerning Mr. Gard that were prepared by his coworkers.

Mr. Gard refers to those documents many times in his opposition to the defendant's motion as "scurrilous" and derides them as being full of "hearsay and innuendo," see Opp. at 22, but he points to no evidence implying that any specific statements made in those documents are false or inaccurate. Indeed, in the twenty-page affidavit he has submitted in support of his opposition, he makes absolutely no attempt to deny the occurrence of the confrontations between coworkers described in the documents, or to identify any specific inaccuracies contained in his coworkers' descriptions of those confrontations. See Opp., Ex. 19.

Mr. Gard complains on several occasions that DOE officials did not interview him concerning his confrontations with coworkers before deciding to place him on administrative leave, see Opp. at 25, but that contention only raises an obvious question: what would he have said during such an interview that would have demonstrated the existence of "inaccuracies" in his records? He implies in his opposition — although not in any piece of record evidence, such as his affidavit — that he would have disputed the statements of some coworkers that he had "yelled" at them, because "there are conflicts concerning what constitutes 'yelling.'" Id. at 14. But a difference of opinion as to whether a person is yelling or merely using a voice that is "deep and very firm," as Mr. Gard has characterized his speech toward Ms. Johnson, MSJ, Ex. 22 at 12, is not the sort of objective inaccuracy targeted by the Privacy Act. See Mueller v. Winter, 485 F.3d 1191, 1198 (D.C. Cir. 2007) ("'[T]he Privacy Act allows for amendment of factual or historical errors. It is . . . not a vehicle for amending the *judgments* of federal officials or . . . other[s].'" (citation omitted)).

Mr. Gard's conclusory claims that records reviewed by his supervisors were inaccurate suggest another question: what alleged inaccuracies were so material that their correction would have prevented the agency from placing him on administrative leave? Having

failed to supply evidence suggesting the existence of *any* inaccuracy, Mr. Gard obviously has not

attempted to identify an inaccuracy so serious that it actually caused him to be placed on leave.

This failure is fatal to his claim; without proof of a causal link between the adverse personnel

action complained of and inaccuracies in agency records, the plaintiff cannot prevail under

Section 552a(g)(1)(C).

   That Mr. Gard has failed utterly to establish such a causal link is not surprising, as

"his complaint really alleges only a wrongful personnel decision, not an invasion of privacy."

Hubbard v. EPA, 809 F.2d at 5.  Mr. Gard truly disputes not the content of the records reviewed

by the agency, but the idea that DOE officials really could have drawn from those records the

conclusion they purported to: that his behavior was sufficiently alarming to justify his temporary

removal from the office as a safety precaution.  See, e.g., Opp. at 8 (condemning Dr. Presant's

opinion that "Mr. Gard exhibited 'paranoid ideation'" and posed "'a threat of violence'" as

"preposterous").  As he makes clear again and again throughout his filings, Mr. Gard does not

believe that his supervisors ever really came to that conclusion at all; instead, he believes that

they merely recited that conclusion as a "pretext" for placing him on leave, which itself was

meant to punish him for his whistle-blowing activity.  Id. at 15 ("Mr. Gard contends that the

scurrilous file was a mere pretext to justify a personnel action" that constituted a

"discriminatory" act against a whistle-blower); see id. at 8 ("Defendant's employees were well

aware of the thin and dubious basis of these allegations [contained in Mr. Gard's records]"

because those allegations had been made for the purpose of "assembl[ing] as much dirt on Mr.

Gard as possible" to serve as "*post-facto* justification" of his placement on leave).

   While this argument might serve as the basis for a whistle-blower claim before the

MSPB — as, in fact, it did serve — it renders Mr. Gard's claims under the Privacy Act utterly

nonsensical. If the defendant placed Mr. Gard on leave not because it believed him to be

mentally unstable and dangerous, but rather because it wanted to punish him for blowing the

whistle, then allegedly false and inaccurate emails and memoranda complaining of Mr. Gard's

erratic conduct were not the proximate cause of the agency's decision; the agency's alleged

desire to retaliate was. And if that is the theory, his claims under Counts V and IX of his

complaint are not Privacy Act claims at all.

   As the foregoing analysis demonstrates, Mr. Gard has failed to demonstrate the

existence of any genuinely disputed issues of fact that are relevant to his claims under Section

552a(g)(1)(C). The Court therefore will enter summary judgment for the defendant as to Counts

V and IX of the complaint.

### B. Claims Under 5 U.S.C. § 552a(g)(1)(D)

   If a claim under the Privacy Act does not allege either (1) a refusal by the

defendant agency to "amend an individual's record in accordance with his request," 5 U.S.C.

§ 552a(g)(1)(A); (2) an agency's refusal to disclose an individual's record to that individual upon

request pursuant to 5 U.S.C. § 552a(d); see 5 U.S.C. § 552a(g)(1)(B); or (3) an adverse agency

determination that was based upon an inaccurate record in violation of 5 U.S.C. § 552a(g)(1)(C),

that claim must be brought pursuant to 5 U.S.C. § 552a(g)(1)(D). That section of the Act

provides that a plaintiff may obtain a civil remedy against an agency that has "fail[ed] to comply

with any other provision" of Section 552a if that noncompliance has had "an adverse effect" on

the plaintiff. 5 U.S.C. § 552a(g)(1)(D). Mr. Gard contends that he has been adversely affected

by the defendant's noncompliance with five "other provisions" of the Privacy Act. The Court

addresses each in turn.

### 1. 5 U.S.C. § 552a(e)(1)

Section 552a(e)(1) requires each agency to "maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President." 5 U.S.C. § 552a(e)(1). Mr. Gard cannot prevail on a claim based on this provision of the statute because he has identified no information about him maintained in DOE's records that is not "relevant and necessary" to an agency purpose. His sole attempt to substantiate his claims under this provision is the assertion that DOE has "intentionally maintained the scurrilous file upon Mr. Gard, even after his return to the workplace." Surreply at 8. The Court is unsure to which file Mr. Gard refers, but assumes that he means a personnel file that contains references to his confrontations with coworkers and their opinions about those confrontations. The claim that such documentation is not relevant or necessary lacks merit. Documents concerning serious intra-employee conflicts and personnel behavior problems are both relevant and necessary to the task of managing any organization with employees. The effectiveness with which its employees are managed partly determines whether DOE is able to serve the purposes for which the agency was created. The documents at issue in this case therefore are relevant and necessary to the agency's completion of its administrative mission, and those documents were not and are not maintained in violation of 5 U.S.C. § 552a(e)(1).

### 2. 5 U.S.C. § 552a(e)(2)

Under 5 U.S.C. § 552a(e)(2), an agency must "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs."

5 U.S.C. § 552a(e)(2).  Mr. Gard asserts that the defendant violated this provision by failing to

interview him regarding his confrontations with coworkers before placing him on administrative

leave.  See Opp. at 9, 18, 24-25.  As has already been discussed, however, see supra at 18-19, Mr.

Gard has not produced any evidence to suggest how an interview with him would have altered

the substance of his records in any way that would have averted the agency's decision to place

him on administrative leave.  In other words, he cannot show that the agency's failure to

interview him had an "adverse effect" on him as required by 5 U.S.C. § 552a(g)(1)(D), and his

claims under Section 552a(e)(2) therefore cannot survive the defendant's motion for summary

judgment.

### 3.  5. U.S.C. § 552a(e)(7)

Section 552a(e)(7) prohibits agencies, except in limited circumstances, from

maintaining any "record describing how any individual exercises rights guaranteed by the First

Amendment."  5 U.S.C. § 552a(e)(7).  Mr. Gard has not identified any records fitting that

description that are maintained by the defendant.  The defendant is entitled to summary judgment

on this claim as a result.

### 4.  5 U.S.C. § 552a(e)(10)

Under the terms of the Privacy Act, an agency must "establish appropriate

administrative, technical, and physical safeguards to insure the security and confidentiality of

records and to protect against any anticipated threats or hazards to their security or integrity

which could result in substantial harm, embarrassment, inconvenience, or unfairness to any

individual on whom information is maintained."  5 U.S.C. § 552a(e)(10).  Mr. Gard claims that

"the wanted poster" produced by the defendant demonstrates that the defendant violated this

provision. Surreply at 9. That claim makes no sense. The notice alerting building security to Mr. Gard's placement on enforced administrative leave was not circulated as a result of any breach of security or data integrity. Indeed, the case record contains no evidence that DOE's record system lacked adequate safeguards or that *any* information from Mr. Gard's file was released because of a breach in that system's integrity. Consequently, the defendant will be awarded summary judgment on this claim.

### 5. 5 U.S.C. § 552a(b)

Except in certain specified circumstances, agencies are prohibited under 5 U.S.C. § 552a(b) from "disclos[ing] any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b). According to Mr. Gard, the defendant violated this provision when Dr. Presant was provided with documents concerning Mr. Gard so that he could evaluate whether Mr. Gard posed a risk to other employees. Surreply at 8-9. Mr. Gard is incorrect.

An agency that maintains a record concerning an individual may disclose that record without the individual's consent so long as the disclosure is to an officer or employee of the agency who "ha[s] a need for the record in the performance of [his or her] duties." 5 U.S.C. § 552a(b)(1). According to undisputed evidence in the record, Dr. Presant is an "occupational medicine consultant" under contract with DOE. MSJ, Ex. 7, Attach. 4; DSMF ¶ 79. He was asked to evaluate the possibility that Mr. Gard's mental health might be impaired to such an extent that he might pose a danger to colleagues. See DSMF ¶ 79. Dr. Presant "ha[d] a need" for at least some documentation concerning Mr. Gard's behavior in order to perform that evaluation.

Furthermore, as a DOE contractor, he qualifies as an "employee" for the purposes of Section 552a(b)(1).  See Mount v. U.S. Postal Serv., 79 F.3d 531, 533-34 (6th Cir. 1996) (disclosure of information from plaintiff's records to physician under contract with defendant agency was acceptable under Privacy Act, 5 U.S.C. § 552a(b)(1), where physician needed the information to evaluate plaintiff's health as it related to his fitness as an employee).  The disclosure to Dr. Presant therefore did not violate the Privacy Act.

IV.  CONCLUSION

For the foregoing reasons, the Court concludes that Mr. Gard has failed to identify evidence in the record that would permit a reasonable factfinder to conclude that the plaintiff had proven his claims under the Privacy Act.  As a result, summary judgment on all counts of the plaintiff's complaint will be entered for the defendant.  An Order consistent with this Opinion shall issue this same day.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  June 9, 2011